**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>DECURTIS HOLDINGS LLC, *et al.*,[1]<br><br>Debtors. | Chapter 7<br><br>Case No.  23-10548 (JKS)<br><br>(Jointly Administered) |
| INVICTUS SPECIAL SITUATIONS MASTER I, L.P., AND UNUMX,<br><br>Plaintiffs,<br><br>v.<br><br>INVICTUS GLOBAL MANAGEMENT, LLC, CINDY CHEN DELANO, AND AMIT PATEL<br><br>Defendants. | Adv. Proc. No. 23-_____ |

**COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**

Invictus Special Situations Master I, L.P. (the "**Fund**"), a secured creditor and DIP Lender in the bankruptcy case of the above-captioned debtors (the "**Debtors**"), with its affiliate UnumX ("**UnumX**" and, collectively with the Fund, the "**Plaintiffs**") hereby file this *Complaint for Declaratory Judgment and Injunctive Relief* (the "**Complaint**") against Invictus Global Management, LLC ("**IGM**"), Cindy Chen Delano ("**Delano**") and Amit Patel ("**Patel**" and, collectively with IGM and Delano, the "**Defendants**"), and aver in support thereof, the following:

---

[1] The Debtors in these chapter 7 cases, along with the last four digits of each Debtor's federal tax identification number include: DeCurtis Holdings LLC (2384) and DeCurtis LLC (9241).

## STATEMENT OF THE CASE[2]

1.  IGM, as DIP Agent for the Fund (as DIP Lender), intercepted $8.6 million in funds that belonged to the Fund and UnumX, and instead had such funds deposited into IGM's own bank account. After being removed as the manager for the Fund, IGM turned over some of the proceeds, but claims to have unilaterally retained approximately $4 million as an extra-contractual "indemnity reserve" for potential litigation claims that may be brought against IGM based on its misconduct. When the Fund and UnumX demanded IGM turn over the remaining proceeds, IGM cynically asserted that this Court's Final DIP Order (the "**DIP Order**") authorized its self-dealing and precludes the Fund and UnumX from recovering the proceeds. But the Court's DIP Order neither permits IGM, acting through Patel and Delano, to syphon millions of dollars for their individual benefit, nor immunizes them from the consequences of their bald theft from the Fund and UnumX.

2.  The Defendants' scheme turns on a twisted interpretation of the agency and reliance provisions of the DIP Order. The Defendants—who controlled both the Fund and IGM—caused IGM, as DIP Agent, to take possession of and retain the proceeds. Although the provisions of the DIP Order relating to DIP Agent indemnification contain a carve-out for gross negligence or willful misconduct, the Defendants assert they are protected under an agency provision stating that the DIP Agent shall not be liable when acting "in accordance with the directions of the Required DIP Lenders or the DIP Lenders, as applicable . . ."

3.  Put otherwise, the Defendants advance an interpretation of the DIP Order that renders the carveout and their own fiduciary duties meaningless. In entering the DIP Order and the agency/reliance clause therein, this Court did not give IGM carte blanche authorization to steal

---

[2]     Capitalized terms used in this section are defined elsewhere in this Complaint.

from the Fund, merely because the Defendants were shameless enough to disregard all semblance of corporate separateness, abuse their control over the Fund, and breach their fiduciary duties to their investors. It was an inherent conflict of interest for IGM to appoint itself as DIP Agent and grant itself indemnification on terms preferential to those to which it was entitled under its underlying agreement with the Fund's investors, which conflict IGM was, on information and belief, neither disclosed to nor approved by the investors.

4. Even if IGM is later entitled to indemnification – an issue not yet before the Court – this is not how indemnification works. IGM is not entitled to indemnification from the Fund, with respect to a claim by the Fund against IGM resulting from IGM having stolen money from the Fund. This Court should not allow IGM to abuse the DIP Order to effectively create a right that does not exist, merely because it had control over the Funds and then could have it direct IGM to do something that could never be challenged in the future. The Defendants' conduct here threatens the integrity of this Court's orders and the bankruptcy process and cannot be left unchecked.

5. Accordingly, the Plaintiffs bring this adversary proceeding for: (I) a declaratory judgment that the Fund and UnumX, as the recipient of DIP Collateral that was foreclosed on by IGM under the terms of this Court's Final DIP Order in the Debtors' chapter 11 proceedings, is the rightful owner of such property and that IGM has no ownership rights in connection therewith and is wrongfully withholding and refusing to remit such property, and (II) injunctive relief prohibiting Defendants from further using or dissipating the proceeds and requiring Defendants to account for and immediately return all proceeds.

## JURISDICTION AND VENUE

6. The United States Bankruptcy Court for the District of Delaware (the "**Court**") has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334(b) and the *Amended Standing Order of Reference for the United States District of Delaware*, dated February 29, 2012.

7. This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(1) and (2) because the disputes herein arise in a case under title 11, and this Court may enter a final order or judgment consistent with these statutes and Article III of the United States Constitution.

8. Venue is proper in this Court pursuant to 28 U.S.C. § 1409.

9. In accordance with Rule 7008-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, Plaintiffs hereby state that they consent to the entry of final orders or judgments by this Court if it is determined that the Court, absent the consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## PARTIES

10. Plaintiff the Fund is a Cayman Islands exempted limited partnership and is a pre- and post-petition secured creditor of the Debtors in these cases.

11. Plaintiff UnumX is a Cayman Islands exempted company that is, on information and belief, 90% owned by the Fund.

12. Defendant IGM is a Delaware limited liability company that is, on information and belief, owned by Patel and Delano.

13. Defendant Patel is an individual that is, on information and belief, a resident of the State of Texas.

14.     Defendant Delano is an individual that is, on information and belief, a resident of the State of Texas.

15.     Defendants are subject to nationwide service of process pursuant to Rule 7004(d) of the Federal Rules of Bankruptcy Procedure.

**FACTS**

**A.  The Debtors Bankruptcy Proceedings and Capital Structure**

16.     On April 30, 2023, DeCurtis Holdings LLC and DeCurtis LLC (collectively, "**DeCurtis**" or the "**Debtors**") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

17.     DeCurtis provided guest experience and operational management product-focused SaaS software solutions, focused on the cruise line industry.

18.     On information and belief, as of the bankruptcy filing, DeCurtis had approximately $43.54 million in funded debt obligations, summarized as follows:

| Funded Debt | Maturity | Outstanding Principal Amount |
|---|---|---|
| Senior Secured Credit Facility | January 21, 2026 | $20.74 million |
| CNB Credit Facility | May 15, 2027 | $13.0 million |
| Main Street New Loan Facility | November 14, 2025 | $9.8 million |
| **Total Funded Debt** | | **$43.54 million** |

19.     The Senior Secured Credit Facility listed in the above chart relates to a January 1, 2022 Credit Agreement, which governs a $15 million first lien term loan credit facility. That facility was amended on April 24, 2023, under which the lenders funded an additional $2.67 million, and again on April 28, 2023, whereby the lenders funded an additional $115,000. As of

5

the Petition Date, there was approximately $20.74 million outstanding under the Senior Secured Credit Facility.

20. As part of the bankruptcy filing, the prepetition senior lenders (in their capacity as post-petition lenders, the "**DIP Lenders**") agreed to extend additional post-petition loans (the "**DIP Loans**"), in the aggregate amount of $6,511,083.73. The DIP Loans also "rolled up" the $20.74 million prepetition Senior Secured Facility, such that the total amount of the DIP Loans equaled approximately $27.25 million.

21. The DIP Loans were secured by substantially all of the Debtors' property (the "**DIP Collateral**").

22. IGM was the administrative agent and collateral agent (collectively, the "**DIP Agent**") for the DIP Loan.

23. IGM was also the investment manager of the Fund, as contracted through the Fund's general partner, which it controlled. The Fund, under the effective control of IGM, was a prepetition senior lender and DIP Lender of the Debtors.

24. On June 23, 2023, the Bankruptcy Court entered a final order approving the DIP Loans (the "**Final DIP Order**"), including IGM's engagement as DIP Agent as set forth in a certain "**DIP Term Sheet**" that was attached as an exhibit to the Final DIP Order.

25. Despite the inherent conflict of interest, IGM used its ability to control the Fund to appoint itself as DIP Agent and unilaterally negotiate the terms of its engagement as DIP Agent, including without limitation with respect to fees and indemnification.

26. The signature page to the DIP Term Sheet filed with the Final DIP Order includes signature blocks for: (a) IGM, as DIP Agent, (b) the Fund, as DIP Lender (to be signed by IGM as

the Fund's investment manager), (c) Corbin Capital Partners, as DIP Lender (though this signature block is in brackets), and (d) the Debtors.

27.     The DIP Term Sheet filed with the Final DIP Order is not signed. To date, IGM has not produced a fully executed copy of the DIP Term Sheet to the Plaintiffs.

28.     Exhibit E to the DIP Term Sheet contains the heading "Agency Provisions." The Agency Provisions exhibit contains standard provisions governing the relationship between a DIP agent and DIP lenders, including indemnification rights.

29.     Section 4 of the Agency Provisions, under the heading "Liability of DIP Agent," contains a general disclaimer of liability for the DIP Agent, except with respect to its own gross negligence or willful misconduct.

30.     Section 5 of the Agency Provisions, under the heading "Reliance by DIP Agent," generally permits the DIP Agent to rely on instructions from the DIP Lenders (or the Required DIP Lenders).

31.     Section 8 of the Agency Provisions, under heading "Indemnification of the DIP Agent," provide that the "DIP LENDERS SHALL INDEMNIFY UPON DEMAND THE DIP AGENT AND EACH RELATED PARTY THEREOF . . . FROM AND AGAINST ANY AND ALL INDEMNIFIED LIABILITIES INCURRED BY IT . . . PROVIDED THAT NO DIP LENDER SHALL BE LIABLE FOR THE PAYMENT TO THE DIP AGENT OR ANY RELATED PARTY THEREOF OF ANY PORTION OF SUCH INDEMNIFIED LIABILITIES FROM SUCH PERSON'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT AS DETERMINED BY A COURT OF COMPETENT JURISDICTION IN A FINAL AND NON-APPEALABLE JUDGMENT, provided, however, that no action taken in accordance with the directions of the Required DIP Lenders or the DIP Lenders, as applicable, shall be deemed to

constitute gross negligence or willful misconduct for purposes of this paragraph 8 of this Exhibit E."

32. The Agency Provisions attached as an exhibit to the DIP Term Sheet do not include any provision authorizing the DIP Agent to deposit DIP Collateral or the proceeds thereof in the DIP Agent's personal bank account.

33. The Agency Provisions attached as an exhibit to the DIP Term Sheet do not include any provision authorizing the DIP Agent, having already deposited DIP Collateral or the proceeds thereof in the DIP Agent's personal bank account, to then retain any amount of such funds to establish an "indemnity reserve" or any similar concept on account of anticipated potential future indemnification claims.  Even if IGM had provided for such conduct under the DIP Term Sheet, it would have constituted conflicted self-dealing.  The failure to include such provisions simply makes this conduct doubly unenforceable.

### B. The DeCurtis Dispute with Carnival

34. Prior to filing bankruptcy, in early 2020, DeCurtis initiated litigation against Carnival Corporation ("**Carnival**") relating to a dispute over whether certain of DeCurtis' technology, referred to as the "**DXP Assets**," misappropriates and infringes on Carnival's intellectual property.

35. In 2023, the litigation resulted in a jury verdict in favor of Carnival.  DeCurtis filed for bankruptcy before the jury verdict was memorialized in a non-final judgment.

36. On June 23, 2023, the same day the Bankruptcy Court entered the Final DIP Order, Carnival commenced an adversary proceeding in the Bankruptcy Court [Adv. Pro. No. 23-50413] (the "**Carnival Adv. Pro.**"), seeking declaratory relief with respect to Carnival's asserted

ownership the DXP Assets, and to prohibit the Debtors from further using Carnival's assets, including the intellectual property embodied in the DXP Assets.

37. On August 9, 2023, the Bankruptcy Court issued an opinion [Carnival Adv. Pro. D.I. 57] (the "**Opinion**"), finding, *inter alia*, that Carnival has an ownership interest in the DXP Assets and granting injunctive relief.

### C. IGM's Partial Strict Foreclosure

38. Subsequent to entry of the Bankruptcy Court's Opinion in the Carnival Adv. Pro., on or about August 16, 2023, IGM issued a notice of termination with respect to the DIP Loans (the "**Default Notice**").

39. On August 17, 2023, the Debtors filed a motion to convert their bankruptcy cases to chapter 7 on August 17, 2023.

40. On information and belief, on August 24, 2023, IGM, both on its own behalf and on behalf of the Fund, executed a "**Direction and Contribution Agreement**," that purportedly directed IGM, in its role as DIP Agent, to foreclose on the DIP Collateral through a Partial Strict Foreclosure under Delaware law.

41. Accordingly, also on August 24, 2023, after expiration of the remedies period under the default notice and before the hearing on the chapter 7 conversion motion, the Debtors and IGM, in its capacity as DIP Agent, completed a Partial Strict Foreclosure under section 9-620 of the Delaware Uniform Commercial Code, through which the DIP Collateral was foreclosed upon by IGM under the terms of a Partial Strict Foreclosure Agreement (the "**PSFA**").

42. Under the PSFA, certain of the DIP Collateral was transferred to UnumX, a new offshore entity formed by IGM for the purpose of receiving the foreclosed-upon property for the benefit of the DIP Lenders. UnumX is a Cayman Islands exempted company that, upon

9

information and belief, is 90% owned by the Fund and 10% owned by a law firm that provided services to the Debtors in connection with the litigation against Carnival and that was owed several million dollars for unpaid legal fees. IGM, acting in its capacity as general partner of the Fund, caused its own principals, Patel and Delano, to be appointed as the directors of UnumX, a subsidiary of the Fund.

43. Upon information and belief, the Partial Strict Foreclosure also included the transfer of most of the Debtors' cash collateral to UnumX. However, IGM improperly caused the Debtors' cash, totaling $666,546.80 (the "**Cash Collateral**"), to be deposited into IGM's personal bank account, rather than an account of the Fund or UnumX, thereby misappropriating such Cash Collateral from the Fund and its investors.

**D. Post-Foreclosure Transactions, Including the $8 Million Virgin Deal**

44. After completing the Partial Strict Foreclosure, IGM caused UnumX, which at that point held title to and possession of the foreclosed upon DIP Collateral, to enter into an agreement with Virgin Cruise Lines ("**Virgin**"), through which certain intellectual property was transferred to Virgin in exchange for a cash payment of $8 million (the "**Virgin Proceeds**"). As with the Debtors' Cash Collateral, IGM improperly misappropriated the $8 million Virgin Proceeds by having such amounts deposited into IGM's personal bank account.

45. Upon information and belief, in addition to the Virgin transaction, IGM, now through its directorship control over UnumX and its subsidiaries, directed the continuation of at least certain aspects of the Debtors' pre-foreclosure business and alleges that it funded such operations with the Cash Collateral and Virgin Proceeds from its own bank account.

46. As of October 3, 2023, IGM asserted that of the total $8,666,546.80 received (comprising the Cash Collateral and the Virgin Proceeds), it had spent $40,824.00 in Software

10

Subscriptions, $825,403.12 for Payroll and Benefits, $738,133.33 for Advisors, and $121,207.15 for Expense Reimbursement, allegedly leaving cash belonging to UnumX in IGM's bank account in the amount of $6,940,979.20.

### E. IGM's Removal as General Partner of the Fund

47. On September 29, 2023, (and subsequent to certain challenges to the Partial Strict Foreclosure in the Bankruptcy Court by Carnival, including a motion for sanctions against IGM), a supermajority group of limited partners of the Fund voted to remove IGM as investment manager of the Fund and Invictus Special Situations I GP, LLC as general partner of the Fund, and appointed TREO Vitus GP ("**TREO GP**") as replacement general partner of the Fund and TREO Asset Management ("**TREO AM**" and collectively with TREO GP, "**TREO**") as replacement investment manager of the Fund in accordance with the Fund's governing documents.

48. Following IGM's removal, Patel and Delano resigned as directors of UnumX. IGM also purported to provide notice of its resignation as DIP Agent.

49. Upon its appointment as replacement general partner and investment manager, TREO promptly began investigating the assets and investments of the Fund, including by delivering books and records requests to IGM and performing other customary diligence. TREO also began addressing issues of corporate governance related to UnumX and its subsidiaries, including engaging counsel in the Cayman Islands and appointing a new independent director.

50. In the course of conducting its diligence, TREO became are of the post-foreclosure transaction with Virgin and that IGM had caused the Cash Collateral and the Virgin Proceeds to be deposited into IGM's bank account, instead of an account of UnumX (as foreclosure transferee) or of the Fund (as the DIP Lender). TREO requested that IGM immediately turn over all property belonging to the Funds and/or UnumX, including the Cash Collateral and the Virgin Proceeds.

**F. IGM's Wrongful Retention of UnumX's Property**

51. On October 3, 2023, Delano, via email to TREO, confirmed that IGM had received $8,666,546.80, and asserted that IGM paid certain amounts, as outlined above "on account of UnumX's expenses." Delano also stated that "[t]here is $2,940,979.20 to be transferred to an account you designate." The difference between this amount and the $6,940,979.20 of UnumX's cash that should still be held by IGM was included by a $4 million "DIP Agent Indemnity" line item that Delano also listed as a debit made "on account of UnumX's expenses."

52. TREO promptly responded to Delano's email, objecting to IGM's proposal to return less than all of UnumX's cash that IGM had caused to be deposited into IGM's own bank account, and instructing IGM to return the entirety of such funds to UnumX immediately.

53. On October 4, 2023, via letter to TREO signed by Delano (the "**October 4 Letter**"), IGM asserted, among other things, that IGM was entitled to broad indemnification under the terms of the DIP Term Sheet and the Final DIP Order.

54. In the October 4 Letter, IGM acknowledges that the indemnification under the DIP Term Sheet "sets forth carveouts to the DIP Agent indemnity for 'indemnified liabilities resulting from . . . gross negligence or willful misconduct . . ." but asserts in connection therewith that the agency provisions of the DIP Term Sheet also preclude a court from finding that its actions constituted gross negligence or willful misconduct so long as they were taken "in accordance with the directions of the Required DIP Lenders or the DIP Lenders, as applicable . . ."

55. In an effort to take advantage of this provision, IGM points to the Direction and Contribution Agreement that IGM executed both on its own behalf and on before of the DIP Lenders, to suggest that it cannot be denied indemnification even for acts constituting gross negligence and willful misconduct, because by executing such agreement with itself, all its actions

ACTIVE\1604611446.3

were "directed by the DIP Lenders." In essence, IGM asserts that, in its capacity as general partner of the Fund, IGM caused the Fund, as DIP Lender, to direct IGM, as DIP Agent, to take actions with respect to the Partial Strict Foreclosure and otherwise, and that because it was so directed, its actions cannot be found to constitute gross negligence or willful misconduct. Plaintiffs have not observed evidence of any actions taken by Defendants to address these obvious conflicts of interest.

56. Separate from IGM's conclusions as to insurmountable scope of the indemnity that it granted to itself, the October 4 Letter also states that, "because of the intensity of the litigation, the DIP Agent has established a $4 million reserve to cover indemnified claims and expenses (including, without limitation, reasonable attorneys' fees)."

57. On October 5, 2023, TREO's counsel sent a letter (the "**October 5 Letter**") to IGM's counsel, David Hillman of Proskauer Rose[3], responding to the October 4 Letter. TREO, on behalf of the Fund and UnumX, objected to and challenged IGM's right to unilaterally retain $4 million of UnumX's cash as an "indemnity reserve" for potential future claims that may be asserted against IGM and that IGM claims may be subject to indemnification under the Final DIP Order.

58. All of the Virgin Proceeds and the Cash Collateral are the property of UnumX under the terms of the PSFA. IGM had no right to deposit such funds in its own bank account and no right to keep such funds now, including to self-fund a reserve for its own future indemnification claims or otherwise.

---

[3] From the limited information provided by Defendants, it appears that IGM paid Proskauer Rose at least $358,103.33 of UnumX's funds on September 29, 2023, the day IGM was removed, which is included as part of the expenses that Defendants purport to set off against such proceeds.

59. On October 11, 2023 (the "**October 11 Letter**"), IGM responded to the October 5 Letter, by letter from Andrew Glenn of Glenn Agre Bergman & Fuentes, asserting again IGM's entitlement to indemnification and refusing to return UnumX's property.  TREO's counsel, on behalf of the Fund and UnumX, promptly responded to the October 11 Letter on the same day, demanding that IGM return UnumX's property and provide an appropriate accounting, including bank records and documentation of expenses, by 12:00 p.m. (ET) on Friday, October 13, 2023.

60. As of this filing, IGM has not returned UnumX's $4 million that IGM claims to be withholding, nor has it provided the requested accounting.

## CLAIMS FOR RELIEF

### COUNT I: Declaratory Judgment Pursuant to 28 U.S.C. § 2201(a)

61. Plaintiffs repeat and reallege the allegations in the preceding paragraphs as if fully set forth herein.

62. Under the Final DIP Order, when IGM, as DIP Agent, exercised remedies and foreclosed on the DIP Collateral, such actions were taken for the benefit of the DIP Lenders, including the Fund, and not for IGM's own personal benefit.

63. Under the PSFA, all foreclosed assets and the proceeds thereof, including the Cash Collateral and the Virgin Proceeds, are owned by UnumX.

64. IGM, whether in capacities as DIP Agent, general partner of the Fund or investment manager to the Fund, does not own and has no ownership interest in any foreclosed assets and the proceeds thereof, including the Cash Collateral and the Virgin Proceeds.

65. Nothing in the Final DIP Order authorizes the DIP Agent to possess DIP Collateral in its own bank account.

66. Nothing in the Final DIP Order authorizes the DIP Agent to continue to possess DIP Collateral after UnumX has demanded its return.

67. Nothing in the Final DIP Order authorizes the DIP Agent to unilaterally retain, and thus withhold, any amount of UnumX's property on account of an "indemnity reserve."

68. IGM's appointment of itself as DIP Agent – including with indemnification terms that are preferential to those to which it is entitled under the terms of the Fund as agreed to with the Fund's investors – represents an inherent conflict of interest that was never disclosed to, let alone approved by, the investors in the Fund, and thus constitutes a breach of IGM's duties and obligations to the Fund.

69. IGM has not sought indemnification from the Fund, and Plaintiffs are unaware of any basis for IGM to presently seek indemnification. Whether or not IGM's conduct at any time constituted willful misconduct or gross negligence is not at issue, because IGM has not asserted a claim for indemnification. Likewise, whether IGM may obtain indemnification even for actions reflecting willful misconduct or gross negligence as a result of the Direction and Contribution Agreement that IGM signed for both sides is also not currently at issue, again because IGM has not asserted a claim for indemnification. These potential future issues have no bearing on IGM's authority to possess and retain UnumX's property or to withhold such property to fund an "indemnity reserve."

70. Moreover, IGM has failed to identify any specific litigation that this reserve is intended to be used for. Notably, to the extent Defendants intend to use property of UnumX, which is indirectly property of the Fund, to fund litigation that they anticipate being brought against them by the Fund itself, this would directly violate the Fund's governing documents that expressly prohibit the advancement of expenses for indemnification in respect of claims made against the

manager by a majority of the investors. The notion that the Defendants could use the Fund's cash that they wrongfully misappropriated to defend against claims by the Fund related to such misappropriation is unconscionable.

71. Under section 28 U.S.C. § 2201, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

72. There is a real, substantial, and justiciable controversy with respect to the ownership and right to possess the Virgin Proceeds and the Cash Collateral, and whether the Final DIP Order permits IGM to retain and withhold UnumX's property, whether on account of some ephemeral "indemnity reserve" or otherwise.

73. Plaintiffs are entitled to a declaration that UnumX owns the Virgin Proceeds and the Cash Collateral and that the Final DIP Order does not authorize IGM to retain and withhold any amounts of the Virgin Proceeds or the Cash Collateral.

### COUNT II: Preliminary and Permanent Injunctive Relief

74. Plaintiffs repeat and reallege the allegations in the preceding paragraphs as if fully set forth herein.

75. IGM has abused and misused its position of trust as DIP Agent, general partner of the Fund and investment manager of the Fund for its own personal benefit, and to the detriment of the Fund, including in its capacity as DIP Lender.

76. IGM has abused and misused its control over UnumX, through its appointment of Mr. Patel and Ms. Delano as directors of UnumX, to cause UnumX's property, including the Virgin

Proceeds and the Cash Collateral, to be misappropriated by IGM and deposited into IGM's personal bank account.

77. IGM has breached its duties and obligations to the Fund and the Fund's investors by appointing itself as DIP Agent and granting to itself preferential indemnification terms without disclosure to or approval by the investors of the Fund.

78. IGM's actions have irreparably harmed UnumX and the Fund, as DIP Lender, by dissipating the cash wrongfully misappropriated by IGM to the extent of at least $1.7 million that IGM admits to having spent, purportedly on behalf of expenses of UnumX.

79. IGM has also harmed UnumX and the Fund, as DIP Lender, by refusing to return $4 million from the Virgin Proceeds and the Cash Collateral, all of which is owned by UnumX and that IGM admits to retaining in its possession, on account of its unfounded and unlawful establishment of an "indemnity reserve."

80. Defendants face no risk of harm from an injunction preventing them from continuing to misappropriate these funds.

81. Public policy favors an injunction to protect the integrity of the bankruptcy process and prevent parties such as Defendants from wrongfully taking the property of an entity to whom they owe fiduciary duties and wrongfully continuing to withhold such property without any contractual or legal basis to do so.

82. Plaintiffs are entitled to a temporary restraining order, a preliminary injunction, and a permanent injunction requiring Defendants to account for all proceeds received and prohibiting Defendants from further use or dissipation of UnumX's property, including without limitation the $4 million wrongfully retained by IGM, and requiring IGM to promptly return UnumX's property to UnumX.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that this Court enter judgment against Defendants as follows:

(1) **ON COUNT I:**

    a. declaring that UnumX owns the Virgin Proceeds and the Cash Collateral and that the Final DIP Order does not authorize IGM to retain and withhold any amounts of the Virgin Proceeds or the Cash Collateral;

(2) **ON COUNT II:**

    a. granting a temporary restraining order, a preliminary injunction, and a permanent injunction prohibiting Defendants from further use or dissipation of UnumX's property, including without limitation the $4 million wrongfully retained by IGM, and requiring IGM to promptly return UnumX's property to UnumX;

(3) for Plaintiffs' attorneys' fees and costs; and

(4) for such other and further relief as the Court deems equitable, just, and proper.

Dated:  October 13, 2023

Respectfully submitted,

**DLA PIPER LLP (US)**

 /s/  Aaron S. Applebaum
Aaron S. Applebaum (DE #5587)
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801
Telephone: (302) 468-5700
Facsimile: (302) 394-2341
Email: aaron.applebaum@us.dlapiper.com

- and -

Noah Schottenstein (admitted *pro hac vice*)
1900 N. Pearl Street, Suite 2200
Dallas, TX 75201
Telephone: (214) 743-4500
Facsimile: (214) 743-4545
Email: noah.schottenstein@us.dlapiper.com

*Attorneys for Plaintiffs*